☐ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>jackwdaly@gmail.com (the "account") that is stored at<br>premises owned, maintained, controlled, or operated by<br>Google LLC, a company headquartered at 1600 Amphitheatre<br>Parkway, Mountain View, CA 94043(See Attachments) | )<br>)<br>)<br>)<br>)<br>)<br> Case No.23-807M(NJ)<br><br>**Matter No.: 2021R00321** |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 1/18/2023_____ *(not to exceed 14 days)*
☐xx  in the daytime 6:00 a.m. to 10:00 p.m.  ☑  at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 1/4/2023 @
6:15 p.m.                                        _____
                                                              *Judge's signature*

City and state: Milwaukee, Wisconsin            Hon. Nancy Joseph, U.S. Magistrate Judge
                                                              *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**ATTACHMENT A**
**Matter No. 2021R00321**

**Property to Be Searched**

This warrant applies to information associated with jackwdaly@gmail.com (the

"account") that is stored at premises owned, maintained, controlled, or operated by Google LLC,

a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**Particular Things to be Seized**

I.      **Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) November 18, 2022 with the Google Reference Number 26897118, Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from April 1, 2022 to present, unless otherwise indicated:

- **SUBSCRIBER AND ACCESS RECORDS:** All business records and subscriber information, in any form kept, pertaining to the account, including: full name; physical address; telephone numbers, including SMS recovery and alternate sign-in numbers; alternative and recovery email addresses, including those provided during registration; usernames, screennames and other identifiers; account status; account creation date; account registration IP address; length of service; records of session times and durations, including log-in IP addresses; methods of connecting; log files; subscriber change history; means and source of payment (including any credit or bank account number); and detailed billing records;

- **DEVICES:** All device information associated with the accounts, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

- **SERVICES:** The types of services utilized, including connected applications and sites, and any dates associated with the commencement or termination of that use;

- **FORWARDING OR FETCHING ACCOUNTS:** All forwarding or fetching accounts relating to the accounts;

- **BROWSING, SEARCH, and APPLICATION USE HISTORY:** All Internet search, browsing history, and application usage history, such as Web & App Activity, including: search terms; browsing history, including application usage; bookmarks; passwords;

autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; all text typed into the Google Chrome address bar or Google search bar, including URLs and IP addresses; all URLs or IP addresses clicked on; user settings; and all associated logs and change history;

- **LOCATION HISTORY:** All records indicating the location at which the account was active, such as Location History and Web & App Activity, including: GPS data; cell site/cell tower information; IP addresses; information associated with each location record, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, and inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car); and associated logs and user settings, including Timeline access logs and change history;

- **GMAIL:** The contents of all emails associated with the account, including, but not limited to: stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the date and time at which each email was sent; the size and length of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

- **CONTACTS:** Any records pertaining to the user's contacts, including: address books; contact lists, including autocomplete suggestions; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

- **CALENDAR:** Any records pertaining to the user's calendar, including: Google Calendar entries; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

- **WEB-BASED CHATS:** The contents of all chats associated with the account, including Google Hangouts, Meet, and Chat, in any format (text, audio, or video) including, but not limited to: stored, deleted, and draft chat communications, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size and length of each communication; user settings; and all associated logs, including access logs and change history;

- **GOOGLE DRIVE**: The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes, lists, applications, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; third-party application data and backups; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device,

other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

- **GOOGLE PHOTOS**: The contents of all media associated with the account in Google Photos or Picasa, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; third-party data; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs, including access logs and IP addresses, of each record;

- **GOOGLE MAPS and TRIPS**: All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; information associated with locations and other data associated with My Maps and Location Sharing; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history;

- **GOOGLE PLAY STORE:** All activity relating to Google Play, including: downloaded, installed, purchased, used, and deleted applications, movies, music, television shows, books, magazines, games, and other files; details of the associated device and Android ID for each application, medium, or file; payment transactions; user settings; and all associated logs, including IP addresses, location data, timestamps, and change history;

- **MOBILE MESSAGING:** The contents of all messages associated with the account, including Google Duo, Android Messages, and Google Allo, in any format (e.g. SMS, MMS, or RCS) including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses and telephone numbers; the size and length of each communication; associated telephone numbers, including SMS recovery numbers; usernames and other identifiers; user settings; and all associated logs and change history;

- **YOUTUBE CONTENTS:** The contents of all media associated with the account on YouTube, whether active, deleted, or in draft, including: copies of videos and other media only if uploaded to, saved to, shared by or shared with the account; edits, comments, likes, chats, and other interactions, including associated URLs; search history; channels; subscriptions; subscribers, friends, and other contacts; playlists; connected applications; associated URLs for each record; creation and change history; privacy settings for each record; and all associated logs, including IP addresses, locations, timestamps, and device identifiers;

49

- **YOUTUBE WATCH HISTORY:** A record of the account's watch history, including: accessed URLs and their associated duration, privacy settings, upload timestamps, tags, IP addresses, change history, location information, and uploading account or identifier; the logs for each access by the account, including IP address, location, timestamp, and device identifier; and change history;

- **YOUTUBE SUBSCRIBER RECORDS:** All business and subscriber records associated with the account on YouTube, including: birthday; name; username and other identifiers; linked accounts; alternate or recovery emails; telephone numbers, including SMS recovery numbers; physical addresses; account status; account creation date; account registration IP address; length of service; means and source of payment (including any credit or bank account number); associated devices; associated Android IDs; and associated logs and change history;

- **ADWORDS/GOOGLE ADS:** All records for advertising transactions by the account relating to Google Ads, AdWords, and DoubleClick for Advertisers, including: bid, location of advertisement (including URL), permitted advertisements, blocked advertisements, design and customization settings, and engagement records; payment transactions; user settings; and all associated logs, including IP addresses, location data, timestamps, and change history;

- **ADVERTISING SUBSCRIBER RECORDS:** All business and subscriber records associated with the account on AdSense, Google Ads, Adwords, and DoubleClick by Google, including: name; user name; physical address; alternate or recovery emails; telephone numbers, including SMS recovery numbers; linked accounts; account status; account creation date; account registration IP address; length of service; associated devices; associated AndroidIDs; means and source of payment (including any credit or bank account number); and all associated logs and change history;

- **LINKED NON-GOOGLE ACCOUNTS:** All records relating to connected applications and websites not controlled by Google, including: applications and websites connected to the account at any time; associated account identifiers; privacy settings and account access permissions; and all associated logs, including access logs using Google credentials, timestamps, IP addresses, and change history.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence and/or instrumentalities of violations of 18 U.S.C. § 1001 (false statements within the jurisdiction of a federal agency); 18 U.S.C. § 1519 (making false records with intent to impede, obstruct or influence the proper administration of any matter within the jurisdiction of a federal agency); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1956 (money laundering), since April 1, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters, persons, or entities:

    a.  Sheriff David Clarke (including but not limited to communications with Sheriff David Clarke and his representatives, counsel, or proxies);

    b.  The Sheriff David Clarke for U.S. Senate (Official Draft Campaign) Super PAC;

    c.  The rules and regulations promulgated by the Federal Election Commission;

    d.  The rules and standards imposed by the Federal Election Campaign Act; and

    e.  The finances—including but not limited to expenditures, obligations, and income—of Jack W. Daly and Nathanael K. Pendley;

    f.  The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

    g.  Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

    h.  Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

i. Evidence indicating the subscriber's state of mind as it relates to the crime under investigation, including interests and motivations; and

j. Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>jackwdaly@gmail.com (the "account") that is stored at premises owned,<br>maintained, controlled, or operated by Google LLC, a company<br>headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043<br>(See Attachments) | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 23-807M(NJ)<br>   **Matter No.: 2021R00321** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1001, 1343 and 1519 | False statements within the jurisdiction of a federal agency; making false records with intent to impede, obstruct or influence the proper administration of any matter within the jurisdiction of a federal agency; and wire fraud. |

The application is based on these facts:

See the attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

SA Eric Burns, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 1/4/2023

*Judge's signature*

City and state:   Milwaukee, WI

Hon. Nancy Joseph, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION FOR A SEARCH WARRANT**
**Matter No. 2021R00321**

I, Eric Burns, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(I)(A) to require Google LLC (hereafter "Google") to disclose to the government records and other information, including the contents of communications, associated with the Google account associated with the email address jackwdaly@gmail.com, that is stored at premises owned, maintained, controlled, or operated by Google, a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043. The information to be disclosed by Google and searched by the government is described in the following paragraphs and in Attachments A and B.

2.      I have been a Special Agent with the FBI since November 2009. I am currently assigned to an FBI squad which investigates financial crimes, civil rights crimes, and public corruption crimes. During my tenure with the FBI, I have participated in investigations involving campaign finance crimes, to include fraudulent political action committees. I have participated in all aspects of investigations including executing search warrants involving, among other things, the search and seizure of computers, computer equipment, software, and electronically stored information.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

1

4.      Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of 18 U.S.C. §§ 1001, 1343, 1519 and 1956 (the "Specified Federal Offenses"), as described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(I)(A), & (c)(I)(A). Specifically, the Court is "a district court of the United States ... that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## SOURCES OF INFORMATION

6.      Special Agents of the FBI have received information concerning the fraudulent scheme described below from Zachary Ryan Zynda, who has been used as a confidential source in this investigation. Zynda began cooperating in the instant investigation in approximately August of 2022. Zynda is cooperating with law enforcement in the hopes of earning cooperation credit or leniency. Zynda's information has been corroborated insofar as his statements are consistent with text messages, e-mails, and financial records reviewed as part of this investigation. Zynda has been convicted of one misdemeanor offense, which did not implicate his capacity for truthfulness. Zynda's knowledge of the fraudulent scheme described below is based on both his participation in it and his conversations with NATHANAEL PENDLEY. Based on the investigation to date, law enforcement believes that (i) Zynda has been credible; and (ii) the information Zynda has provided is reliable.

## BACKGROUND ON THE FEDERAL ELECTION COMMISSION (FEC) AND POLITICAL ACTION COMMITTEES (PACS)

7.      The Federal Election Commission (FEC) is the independent regulatory agency charged with administering and enforcing the federal campaign finance law. The FEC has

2

jurisdiction over the financing of campaigns for the U.S House, Senate, Presidency and Vice Presidency. Federal campaign finance law covers three broad subjects: (1) public disclosure of funds raised and spent to influence federal elections, (2) restrictions on contributions and expenditures made to influence federal elections, and (3) the public financing of presidential campaigns.

8.      Once an individual decides to campaign or become a candidate for federal office, the individual must register with the FEC as a candidate, designate and register a principal campaign committee, and begin to file reports with the FEC.

9.      The term "committee" encompasses several different political groups that receive and spend money in federal elections. A political committee is an entity that meets one of the following conditions: (1) an authorized committee of a candidate; (2) any club, association, or other group of persons that receives contributions or makes expenditures, either of which aggregate over $1,000 during a calendar year; (3) a local unit of a political party (except a state party committee) that: (a) receives contributions aggregating over $5,000 during a calendar year; (b) makes contributions or expenditures either of which aggregate over $1,000 during a calendar year or (c) makes payments aggregating over $5,000 during a calendar year for certain activities that are exempt from the definitions of contribution and expenditure; or (4) any separate segregated fund upon its establishment.

10.      A Political Action Committee (PAC) is a popular term for a political committee that is neither a party committee nor an authorized committee of a candidate. PACs directly or indirectly established, administered, or financially supported by a corporation or labor organization are called separate segregated funds (SSFs). PACs without such a corporate or labor sponsor are called nonconnected PACs.

3

11.     A nonconnected committee is any committee that conducts activities in connection with an election, but that is not a party committee, an authorized committee for any candidate for federal election, or an SSF. The name of a nonconnected committee may not include the name of any candidate for federal office and may not use a candidate's name in any solicitations or other communications to the general public, unless the name clearly shows opposition to the candidate. The one exception to this rule is the name of a "draft committee." A draft committee is a political committee that is established solely to draft an individual or to encourage him or her to become a candidate for federal office. A draft committee may use the name of an individual in its official name, but only if the committee's name clearly indicates that it is a draft committee.

12.     The type of nonconnected PAC one forms depends on what he or she wants to do: make contributions to federal candidates, donate funds to state and local candidates, and/or make independent expenditures to support or oppose federal candidates.

13.     Independent expenditure-only political committees, or "Super PACs," are committees that may receive unlimited contributions from individuals, corporations, labor unions and other PACs for the purpose of financing independent expenditures and other independent political activity.

14.     The Federal Election Campaign Act ("the Act") requires political committees to register with the FEC. According to the FEC, a nonconnected committee becomes a political committee once its contributions or expenditures exceed $1,000 in a calendar year. Additionally, nonconnected committees, as is the case with all political committees required to register with FEC, are subject to certain reporting requirements.

15.     Amongst the many FEC reporting requirements, nonconnected committees are required to itemize receipts and disbursements when they meet certain criteria. With respect to disbursements, nonconnected committees must itemize, regardless of amount, when the

4

disbursement meets any one of the following criteria: (1) contributions to candidates and political committees; (2) expenditures for allocated federal/nonfederal activity; (3) loan repayments; (4) loans made by the committee; and (5) transfers to affiliated committees. A disbursement that does not fall under of the aforementioned categories must be itemized if it exceeds $200 when aggregated with other disbursements made to the same payee during the calendar year.

## PROBABLE CAUSE

### Initial Investigation

16.     Over the course of the investigation, which began in 2021 after law enforcement's review of related open-source reporting, the FBI has determined JACK DALY and NATHANAEL PENDLEY, and others yet unknown, likely made false representations to the FEC, misled campaign contributors, and misappropriated contributions from the Sheriff David Clarke[1] for U.S. Senate (Official Draft Campaign) Super PAC (the "Draft Sheriff Clarke PAC"). Please note that the name of the Draft Sheriff Clarke PAC was eventually changed to Bold Conservatives PAC.

17.     On August 14, 2016, according to information received by subpoena from GoDaddy on September 26, 2022, the website www.sheriffclarkeforsenate.com was registered by a Kay Daly. A review of the website revealed it was for the Draft Sheriff Clarke PAC and identified DALY, who is Kay Daly's spouse, as the National Chairman for the PAC.

18.     On January 19, 2017, DALY, a licensed attorney currently residing in North Carolina, registered the Draft Sheriff Clarke PAC by filing FEC Form 1, Statement of Organization, with the FEC. According to information provided by DALY on FEC Form 1, as well as information regarding the committee on the FEC's website, the Draft Sheriff Clarke PAC was formed as a nonconnected Super PAC (Independent Expenditure-Only).

---

[1] DAVID CLARKE is the former Sheriff of Milwaukee County and served in that role from March 2002 to August 2017.

19.     According to FEC Form 1 filed by DALY for the Draft Sheriff Clarke PAC, DALY initially listed himself as the Chairman, Treasurer, and Custodian of Records of the PAC. Furthermore, DALY listed email addresses jackwdaly@gmail.com and jackwdaly@me.com as the PAC's email addresses and provided telephone number 703-200-6057 as his telephone number. DALY is also the listed subscriber to that number.

20.     According to the FEC, the treasurer is responsible for filing complete and accurate reports and statements on time, signing all reports and statements, depositing receipts in the committee's designated bank within 10 days of receipt, authorizing expenditures or appointing an agent (either orally or in writing) to authorize expenditures, monitoring contributions to ensure compliance with the Act's limits and prohibitions, and keeping the required records of receipts and disbursements.

21.     On January 19, 2017—the same day DALY registered the Draft Sheriff Clarke PAC with the FEC—a Wisconsin-based television station published an article on its website regarding the Draft Sheriff Clarke PAC. The article made several references to PENDLEY, one of the Draft Sheriff Clarke PAC's advisory board members. PENDLEY is a North Carolina-based attorney (though his license has seemingly been suspended since 2011). PENDLEY told the Wisconsin-based television station that the Draft Sheriff Clarke PAC already had thousands of signatures, and that PENDLEY had approached CLARKE about the U.S. Senate bid a few months prior.

22.     A review of open-source database information indicates DALY and PENDLEY have historical connections and have been involved in questionable political endeavors since at least 2000. For example, in February 2000, DALY and PENDLEY recruited a homeless man to run against an incumbent North Carolina state auditor who had the same last name in order to cause confusion on the Democratic primary ballot.

23.    A further review of open-source database information indicates DALY also has a history of financial issues. Between September 2011 and September 2014, DALY filed for Chapter 13 bankruptcy three times and Charter 7 bankruptcy one time. Further, in or about November 2014, DALY had his residence in Virginia, where he appeared to be living at the time, foreclosed upon.

Financial Background

24.    On November 18, 2016, according to information received by subpoena from Wells Fargo on December 30, 2021, DALY opened a business checking account, account number ending in x7576, in the name of Sheriff David Clark for US Senate Draft Committee d/b/a Draft Sheriff Clark (the "x7576 PAC Account"). DALY listed himself as the "Key Executive with Control of the Entity" and described the business as an FEC registered candidate draft committee. DALY was the sole signatory on the account.

25.    On February 1, 2017, according to information received by subpoena from Wells Fargo on December 30, 2021, DALY opened another business checking account, account number ending in x8501, in the name of Sheriff David Clarke for US Senate Draft Committee d/b/a Draft Sheriff Clark (the "x8501 PAC Account"). DALY listed himself as the "Key Executive with Control of the Entity" and described the business as an FEC registered candidate draft committee. DALY was the sole signatory on the account.

26.    According to information received by subpoena from Wells Fargo on December 30, 2021, DALY has maintained a personal joint checking account with his spouse since September 2011, account number ending in x1873 (the "x1873 Personal Account"), as well as a business account in the name of Reach Right LLC since May 2018 (the "x0530 Business Account"). DALY and his spouse are co-signatories on the x1873 Personal Account, and DALY is the sole signatory on the x0530 Business Account.

7

27.     According to information received by subpoena from Woodforest National Bank on April 12, 2022, PENDLEY has maintained a personal joint checking account with his spouse since January 2008, account number ending in x6172 (the "x6172 Personal Account"). PENDLEY and his spouse are co-signatories on the account.

Draft Sheriff Clarke PAC Activity

28.     Beginning in January 2017, DALY sent fundraising emails to prospective donors from an account believed to be created, maintained, and controlled by DALY, chairman@sheriffclarkeforsenate.com[2]. In one such fundraising email, DALY identified himself as the National Chairman for the Draft Sheriff Clarke PAC. The email stated, in part, "David is willing to run: he just has to know that he has enough national support…" The email was signed, "For the Rule of Law, Jack W. Daly, Esq."

29.     According to information received by subpoena from Google on September 14, 2021, Google account 582519106256 is registered to email address jackwdaly@gmail.com (the "Account") and is subscribed to a "Jack Daly" with recovery email address jackwdaly@me.com. The Account was created on February 10, 2008, and the Account was logged into as recently as September 2021. According to information provided by Google, the Account uses the following Google services: Web & App Activity, Gmail, Google Services, Google Hangouts, iGoogle, Google Alerts, Google Drive, Google Docs, Google Shopping, YouTube, Google Calendar, Google Analytics, Google Chrome Sync, Has Madison Account, Google Voice, Google Maps Engine, Android, Google Sites, Google Photos, Google My Maps, Contacts, Google Payments,

---

[2] According to information received by subpoena from Google on February 23, 2022, Google account 30554225093 is registered to email address chairman@sheriffclarkeforsenate.com. The account is subscribed to a "Jack Daly" with recovery email address jackwdaly@gmail.com and recovery telephone number 703-200-6057. The account was created on January 4, 2017 and the last login was on or about April 26, 2018.

Google Play Music, Google AdWords, Google AdSense, Google Keep, Has Google One Membership Information.

30. According to information received by subpoena from Yahoo on August 2, 2022, Yahoo account pendleynate@aol.com is subscribed to a "Nate Pendley" with recovery email address bartedwards@netzero.net and recovery telephone number 336-918-1994. The Account was created on August 20, 2001, and the Account was most recently logged into on July 26, 2022.

31. During the course of this investigation, I have identified two additional telephone numbers, 340-513-1639 and 340-626-3110, subscribed to by a U.S. Virgin Islands entity owned by DALY and believed to be used by DALY and PENDLEY, respectively. With respect to telephone number 340-513-1639, according to information received by search warrant from Apple on September 16, 2022, this telephone number was saved in PENDLEY's contacts as "Daly's Island iPhone" (hereinafter referred to as "Daly's Island Phone"). According to information received by subpoena from AT&T on October 27, 2022, this telephone number has been subscribed to by DALY since June 19, 2019. With respect to telephone number 340-626-3110, according to information received by search warrant from Apple on April 22, 2022, this telephone number was saved in DALY's contacts as "Pendley's Island Phone" (hereinafter referred to as "Pendley's Island Phone"). According to information received by subpoena from AT&T on August 6, 2022, this telephone number has also been subscribed to by DALY since June 19, 2019.

32. Between December 1, 2016 and July 5, 2022, according to information received by court order from Yahoo on August 4, 2022, PENDLEY exchanged thousands of emails with DALY at the Account and the jackwdaly@me.com email address listed in FEC Form 1 for the Draft Sheriff Clarke PAC, including on days and at specific times relevant to the Specified Federal Offenses, as further described below.

9

33. A review of the 2017-2018 Draft Sheriff Clarke PAC's disbursements reports filed with the FEC revealed DALY may have met with CLARKE in February 2017 in Washington, DC. Per the FEC filed disbursements reports, DALY claimed a $46 expense for "[p]arking for meeting with Sheriff Clarke at the Capitol Hill Club."

34. On March 30, 2017, according to information received by search warrant from Apple on April 22, 2022, DALY forwarded an email to both an email address subscribed to by CLARKE and PENDLEY. The email DALY received that he forwarded was from a Milwaukee-based journalist inquiring about the Draft Sheriff Clarke PAC.

35. On March 30, 2017, according to information received by subpoena from AT&T on September 18, 2021, DALY received one incoming call[3] that lasted approximately 27 minutes from a telephone number believed to be used by CLARKE. Law enforcement believes CLARKE used this number because: (i) CLARKE is associated with this number in open source information that has proven reliable in the past; and (ii) according to information received by search warrant from Apple on April 22, 2022, the telephone number believed to be used by CLARKE was saved in DALY's contacts as "David Clarke." Additionally, between March 30, 2017 and May 17, 2017, DALY and the telephone number believed to be used by CLARKE exchanged at least seven text messages.

CLARKE Disclaims Interest

36. On May 23, 2017, a news website based in Washington, D.C. published an article alleging the Draft Sheriff Clarke PAC was one of several PACs soliciting donations for candidates that were not running for office. The article made reference to a book CLARKE published in February 2017 wherein CLARKE stated, "I have no interest in running for elected office other

---

[3] Please note that an earlier legal process in this matter mistakenly identified the receiving line associated with this call. This was scrivener's error.

than being sheriff. I'm not running for mayor, I'm not running for congressman, I'm not running for senator, and I'm not running for governor." The website interviewed DALY for its article, and DALY stated he would be "disappointed" if CLARKE did not run for U.S. Senate. During the interview, DALY claimed more than 100,000 people had signed the PAC's "pledge" supporting CLARKE's candidacy and that 20,000 donors had already given to the Draft Sheriff Clarke PAC. DALY further claimed that he was operating the PAC as "an affair of the heart, not of the pocketbook," and went on to tell the website, "I have taken not one red cent since the first dollar came in, notwithstanding the fact that my service as its primary administrator would justify the kind of hefty salaries many PAC administrators get."

37.     According to information filed with the FEC, DALY reported the Draft Sheriff Clarke PAC had approximately 1,300 donors, in total, between January 2017 and December 2017.

38.     On July 21, 2017, CLARKE was interviewed by a radio show host where he stated he was not running for U.S. Senate and that the Draft Sheriff Clarke PAC was a scam. During the interview, CLARKE stated, "Every time I turn around, I talk to people and say, 'No, I'm not running for Senate, hang onto your money'." CLARKE was asked specifically about the Draft Sheriff Clarke PAC, to which he stated, "It's a scam PAC really." Despite the public denouncement, DALY continued to solicit donations for the Draft Sheriff Clarke PAC.

39.     Between July 21, 2017 and December 2, 2017, FEC contribution reports revealed the Draft Sheriff Clarke PAC received approximately $60,000 in donations, including from individuals located in the Eastern District of Wisconsin. For example, on August 15, 2017, the Draft Sheriff Clarke PAC received a $500 donation from an individual residing in Kenosha, Wisconsin.

11

40.	On July 21, 2017, according to information received by search warrant from Google on April 19, 2022, the Account sent an email to PENDLEY with the subject line, "OMG." The email contained a screenshot of a Tweet by a radio talk show. The Tweet stated, "There is a scam pac trying to convince people @SheriffClarke is running for Senate. CLARKE is NOT running for Senate. Period."

41.	On September 2, 2017, at approximately 1:37 PM CST, according to information received by subpoena from AT&T on September 18, 2021, DALY and PENDLEY had an approximately 55-minute telephone call.

42.	On September 2, 2017, at approximately 1:59 PM CST, and presumably while PENDLEY and DALY were on the telephone, according to information received by search warrant from Google on April 19, 2022, the Account received a forwarded email from CLARKE with the subject line, "Jack Daly is at it again – he's collecting contributions". The email CLARKE forwarded to the Account contained a link to donate to the Draft Sheriff Clarke PAC. CLARKE's email to DALY stated, "Jack what is this? You are well aware that I am NOT running for US Senate. I announced that a month ago and you were contacted by a local newspaper writer about my announcement that I was NOT running. Do NOT raise any more money using my name."

43.	At approximately 2:46 PM CST, and approximately 14 minutes after DALY and PENDLEY terminated their telephone call, the Account received an email from PENDLEY with the subject line, "Clarke Email Response -- Fill in the bad guys." The email was addressed to "David" and signed "Jack," giving the appearance that PENDLEY was drafting a suggested response to CLARKE's email for DALY. The email stated, in part, "I stopped putting my money into the draft PAC" when CLARKE publicly denounced the Draft Sheriff Clarke PAC on July 21, 2017. The email further stated, in part, "I also stepped back as the pac's Treasurer and frankly

12

assumed the new crew would be more or less winding things down," but that "I of course do have personal connections with the new Treasurer, and I will see what I can do."

44.     At approximately 3:48 PM CST,[4] DALY responded, via the Account, to CLARKE using very similar and, at times, the exact same language PENDLEY recommended to DALY. DALY's email to CLARKE stated, in part, that he "stopped putting my money into the draft pac" when CLARKE publicly denounced the Draft Sheriff Clarke PAC on July 21, 2017. DALY further stated, in part, "I stepped back as the pac's Treasurer" and "assumed the new crew would be more or less winding things down." DALY further stated, in part, that he "had personal connections with the new Treasurer" and would "see what I can do."

45.     On September 2, 2017, between 3:19 and 3:22 PM CST, which is after the Account received the aforementioned email from PENDLEY but before the Account responded to CLARKE's email, according to information received by search warrant from Google on April 19, 2022, DALY performed the following searches utilizing his Google account: "fec treasurer ten days" and "fec appointment of new treasurer". Furthermore, at 3:22 PM CST, DALY visited a webpage on the FEC's website titled, "Appointing a treasurer."

46.     On September 2, 2017, at approximately 3:25 PM CST, according to information received by subpoena from AT&T on September 18, 2021, DALY and PENDLEY had an approximately 41 minute telephone call.

47.     On September 2, 2017, at approximately 3:59 PM CST, according to information received by search warrant from Google on April 19, 2022, the Account received an email from an editor at a Washington-DC based news website with the subject line, "Still using Sheriff Clarke's name?" The body of the email stated, in part, "It's come to my attention that the Draft

---

[4] Please note that in other legal process in this matter, a different timestamp was provided for this message, due to a scrivener's error involving the appropriate time zone.

Sheriff Clarke PAC is fundraising off of Clarke's resignation. Do you have any new reason to believe that Clarke is running for Senate in 2018? And do you have any comment on Clarke calling your PAC a 'scam PAC' just over a month ago?"

48.     One minute later, at approximately 4:00 PM CST, and presumably while PENDLEY and DALY were on the telephone, the Account forwarded the aforementioned email to PENDLEY.

49.     At approximately 6:02 PM CST, according to information received by subpoena from AT&T on September 18, 2021, DALY and PENDLEY had an approximately 12-minute telephone call.

50.     At approximately 6:14 PM CST, approximately the same time DALY and PENDLEY terminated their telephone call, the Account responded to the Washington DC-based news website editor. DALY's response email stated, "I'm behind the wheel of a car as I write this. I've forwarded your email to the pac's new treasurer. It wouldn't surprise me if he's out of town for Labor Day weekend. Assuming you're working on a story, are you on deadline and who is the editor?"

51.     On September 6, 2017, according to information received by subpoena from AT&T on September 18, 2021, DALY had an approximately 22-minute telephone call with a telephone number subscribed to by a "Zachary R. Zynda."

52.     On September 7, 2017, at approximately 10:52 PM CST,[5] according to information filed with the FEC, an amended FEC Form 1 was electronically filed with the FEC for the Draft Sheriff Clarke PAC to change the PAC's Treasurer and Custodian of Records from DALY to an

---

[5] Please note that in other legal process in this matter, a different timestamp was provided for this filing, due to a scrivener's error involving the appropriate time zone.

individual named Ryan Zynka.[6] The PAC's mailing address and email address were also changed to 2020 Armstrong Mill Road #605, Lexington, Kentucky 40515 and ryanzynka@gmail.com,[6] respectively.

53.    On September 7, 2017, at approximately 2:45 PM CST, according to information received by subpoena from Google on March 1, 2022, Google account RyanZynda@gmail.com (the "fake Zynda account") was created. The fake Zynda account listed PENDLEY's email address as the recovery email account and PENDLEY's telephone number as the recovery telephone number. The fake Zynda account was last logged into on December 5, 2019 at approximately 3:44 PM CST.

54.    On September 7, 2017, less than 30 seconds after the fake Zynda account was created, according to information received by search warrant from Yahoo on August 23, 2022, the fake Zynda account forwarded the "welcome to your new Google Account" email it received when it was created to PENDLEY.

55.    Based on information gathered during the course of this investigation, I believe DALY and PENDLEY, and possibly others unknown, conspired to create the fake Zynda account and submit a false filing to the FEC.

56.    On September 7, 2017, at approximately 5:25 PM CST, according to information received by search warrant from Apple on April 22, 2022, DALY logged into the following url: https://webforms.fec.gov/webforms/form1/login.htm.    DALY    logged    in    with    Username

---

[6] Based on information gathered during the course of this investigation, I believe the individual who purportedly replaced DALY as the Custodian of Records and Treasurer is Zachary Ryan Zynda (previously identified as a confidential source), not "Ryan Zynka." Indeed, according to information filed with the FEC for the Draft Sheriff Clarke PAC, on October 26, 2017, a second amended FEC Form 1 was filed to correct "Zynka" to "Zynda" and to correct the email address from RyanZynka@gmail.com to RyanZynda@gmail.com.

15

"C00631382." According to information filed with the FEC, the Draft Sheriff Clarke PAC's FEC identification number is C00631382.

57.     On September 7, 2017, between 5:38 and 5:44 PM CST, while presumably logged into the aforementioned FEC url, according to information received by search warrant from Google on April 19, 2022, DALY performed the following searches utilizing the Account: "ryan zinke," "zachary zynka lexington ky," "zachary zynka," and "ryan zynka".

58.     On September 10, 2017, according to information received by search warrant from Apple on April 22, 2022, DALY logged into the fake Zynda account by visiting url https://accounts.google.com/ServiceLogin/identifier and utilizing the Username "ryanzynda@gmail.com." DALY last logged into the aforementioned url with username ryanzynda@gmail.com on December 5, 2019 at approximately 3:44PM CST, the same date and time as the last login to the fake Zynda account, as indicated in paragraph 59 above.

Disguised Payments to PENDLEY & DALY

59.     The investigation has revealed PENDLEY received monies directly from the Draft Sheriff Clarke PAC that were disguised as payments to a digital design and hosting company located in North Carolina.

60.     Based on a review of the 2017-2018 Draft Sheriff Clarke PAC's receipts and disbursements reports filed with the FEC, between January 25, 2017 and September 18, 2017, the Draft Sheriff Clarke PAC purportedly paid $68,972.65 to an entity called Raven Creative. There were five separate disbursements to Raven Creative disclosed to the FEC by the Draft Sheriff Clarke PAC, and the purpose of the disbursements, according to the itemized disbursement reports for the disbursements to Raven Creative that were filed with the FEC by the Draft Sheriff Clarke

16

PAC, were for "Ad production for website, radio and television," "Copywriting and editing for website, digital and print media," and "Copywriting and Editing Services."

61.    A review of the x7576 PAC Account and x8501 PAC Account revealed $68,972.65 was paid to PENDLEY, once by check and four times by wire, on the same dates and for the same amounts as the five separate disbursements disclosed to the FEC as disbursements to Raven Creative.

62.    A review of the x6172 Personal Account revealed the four wire transactions from the x7576 PAC Account and x8501 PAC Account were deposited in the x6172 Personal Account. A review of the x7576 PAC Account revealed the check, dated January 24, 2017, was cashed.

63.    A further review of the itemized disbursement reports for the disbursements to Raven Creative that were filed with the FEC by the Draft Sheriff Clarke PAC revealed two different addresses for Raven Creative. The first three itemized disbursement reports, dated January 25, 2017, April 10, 2017, and May 11, 2017, list a mailing address of 1257 Marsolan Ct., Henderson, Nevada for Raven Creative. A review of law enforcement database information revealed that 1257 Marsolan Ct. Henderson, NV is a townhouse where one of PENDLEY's daughters resided in 2017.

64.    A review of the final two itemized disbursement reports, dated July 7, 2017, and September 18, 2017, list a mailing address of 306 Lake Manor Rd., Chapel Hill, NC for Raven Creative. A review of open-source information revealed 306 Lake Manor Rd., Chapel Hill, North Carolina is the address for an entity called Raven Creative, Inc. According to its website, Raven Creative, Inc. is a digital design and hosting company incorporated in North Carolina. Based on open-source research, I was unable to identify any apparent relationship or connection between

17

Raven Creative, Inc. and the Draft Sheriff Clarke PAC, DALY, PENDLEY, or PENDLEY's daughter.

65. According to information received by subpoena from Raven Creative, Inc. on November 19, 2022, Raven Creative, Inc. had no records of any job or sales activity for the Draft Sheriff Clarke PAC, DALY, or PENDLEY since Raven Creative, Inc. was established in 1998.

66. Like PENDLEY, DALY also received monies directly from the Sheriff David Clarke PAC that were not disclosed to the FEC. Additionally, and in contrast to DALY's history of financial issues, since establishing the Draft Sheriff Clarke PAC, DALY has purchased numerous assets using, at least in part, the monies he received directly from the Draft Sheriff Clarke PAC.

67. A review of the x7576 PAC Account revealed that on August 17, 2017, and August 22, 2017, DALY transferred $20,000 and $5,000, respectively, to the x1873 Personal Account. Based on a review of the 2017-2018 Draft Sheriff Clarke PAC's receipts and disbursements reports filed with the FEC, DALY did not disclose the $20,000 and $5,000 he received from x7576 PAC Account.

68. A review of the x8501 PAC Account revealed that on May 18, 2018, DALY transferred $50,000 to the x1873 Personal Account. Based on a review of the 2017-2018 Draft Sheriff Clarke PAC's receipts and disbursements reports filed with the FEC, neither DALY nor Zynda disclosed the $50,000 that Daly received from the x8501 PAC Account[7].

69. According to an open-source database search, in June 2018, DALY and his spouse purchased a residence in North Carolina for $1.45 million. The residence was financed with a

---

[7] It should be noted that DALY wrote a check for $50,000, dated July 3, 2017, from the x1873 Personal Account that was subsequently deposited into the x8501 PAC Account on January 23, 2018. In reviewing the 2017-2018 Draft Sheriff Clark PAC receipts reports filed with the FEC, DALY reported $50,000 as a contribution to the Draft Sheriff Clarke PAC on July 3, 2017.

18

$1.15 million loan. A review of the x1873 Personal Account revealed that on June 19, 2018, DALY sent approximately $270,000, via wire transfer, to a North Carolina-based law firm whose practice areas include residential property closing.

Initial Zynda Interviews

70.     On August 29, 2022 and August 30, 2022, law enforcement interviewed Zynda. Zynda stated he performed "odd jobs" for the Draft Sheriff Clarke PAC, and that he helped with some IT work. He stated he was paid in cash by PENDLEY. Zynda stated he did not recognize the RyanZynda@gmail.com email address, that he was not associated with it, and that he did not go by the name "Ryan." Zynda further stated that he did not fill out or submit any forms to the FEC on behalf of the Draft Sheriff Clarke PAC, did not know what it meant to the be Treasurer or Custodian of Records for a PAC, and that he had never seen an FEC Form 1 in his life.

71.     Regarding the approximately 22-minute telephone call on September 6, 2017, with DALY, as noted above, Zynda stated he received a text message from PENDLEY prior to that call wherein PENDLEY told Zynda he would be calling him from 703-200-6057, the telephone number subscribed to by DALY. Zynda did not know if DALY was on the call; Zynda only recalled speaking to PENDLEY.

Zynda Proffer

72.     On September 26, 2022, law enforcement interviewed Zynda pursuant to a proffer letter from the United States Attorney's Office for the Eastern District of Wisconsin. Zynda confirmed much of what he stated on August 29, 2022 and August 30, 2022, but provided additional context around the use of his name and information in FEC filings associated with the Draft Sheriff Clarke PAC.

19

73. Additionally, Zynda reviewed text messages he exchanged with PENDLEY on September 6, 2017 and September 7, 2017 and provided law enforcement with copies of the text messages, to include the following: on September 6, 2017, PENDLEY sent a text message to Zynda, which stated, in part, "I want to chat with you about an opportunity to be part of the Clarke project and make a little money in the process." PENDLEY further stated, "I will be calling from 703.200.6057" (previously identified as the telephone number subscribed to by DALY). Zynda stated he did not recall if DALY was on this call and only recalled speaking with PENDLEY. Zynda did not know DALY's telephone number. Zynda stated he recalled he and PENDLEY generally discussed the need for Zynda to have a title/role with respect to the work he was doing in order to continue to be paid.

74. Zynda additionally described how on September 7, 2017, Zynda met PENDLEY at a restaurant in Clemmons, North Carolina to further their discussion from the September 6, 2017 telephone call. Zynda recalled PENDLEY telling him that PENDLEY and DALY needed Zynda to have an official title/role with the Draft Sheriff Clarke PAC in order for Zynda to be paid. PENDLEY told Zynda that one of his daughters had a similar title/role with a PAC, but Zynda could not recall if PENDLEY was referring to the Draft Sheriff Clarke PAC or a different PAC.

75. Following the meeting, on September 7, 2017, between approximately 12:00 and 9:27 PM CST, PENDLEY and Zynda had the following text message exchange, in part:

> PENDLEY: "Let's use that old Kentucky address for the first form. The FEC will send nothing there anyway. I can get a post office box in Nevada for a permanent address."
>
> Zynda: "So you can assure me that we're not doing anything illegal? There is no risk involved? And we will be doing good work?... Also would it be better to put this in as Ryan Zynda I Sumbu [sic] times go by my middle name"
>
> PENDLEY: "It is definitely completely legal. There is risk in everything of course, because of nut jobs out there, but I don't see serious risk of anything or I wouldn't be doing it myself. Zero risk of anything criminal… Ryan is great…"

20

Zynda: "… where do I sign the paperwork at"

PENDLEY: "You do not need to sign anything right now for the PAC. It's an electronic filing with the FEC dot ORG. Jack will do it."

Zynda: "So how much do we tell jack I'm worth? And I want to do more then just use my name…"

PENDLEY: "We will ease you in. I'll see what I can do. Once you are ensconced it won't be as awkward to have that discussion. So you will know, I haven't been paid since the 4th of July but when there is money flowing it becomes much easier to share dollars…"

Zynda: "I am a hard worker"

PENDLEY: "I forgot to ask for the Kentucky address. Send it to me."

Zynda: "2020 Armstrong mill Road #605 Lexington, Ky 40515…"

76.     I believe, based on my training, experience, knowledge of this investigation, and the nature of the information exchanged (to include the address that was eventually used on FEC submissions in this matter), that the foregoing text message exchange is reflective of PENDLEY's plan to falsely list Zynda as the Treasurer of the Draft Sheriff Clarke PAC and thereby conceal PENDLEY and DALY's culpability for the fraudulent scheme described herein. Indeed, the aforementioned text message from PENDLEY to Zynda wherein PENDLEY asked for the "Kentucky address" was sent at approximately 9:00 PM CST, which is approximately two hours before the amended FEC Form 1 was electronically filed with the FEC for the Draft Sheriff Clarke PAC.

77.     With respect to the use of his middle name, Zynda stated he previously lost some friends because of his political beliefs, so he did not want his true name and address on anything affiliated with the Draft Sheriff Clarke PAC for fear of losing additional friends.

78.    Between October 10, 2022, and October 13, 2022, Zynda, acting at law enforcement's direction, exchanged several text messages with PENDLEY. Those text messages were provided to law enforcement by Zynda with Zynda's consent. They were also essentially logistical, with Zynda indicating to PENDLEY that Zynda wanted to run some things by him.

79.    On October 13, 2022, 4:11 PM CST, at law enforcement's direction, Zynda placed a consensually recorded telephone call to PENDLEY at the 336-918-1994 telephone number, which was verified using the FBI's telephonic consensual monitoring system. During that call, Zynda told PENDLEY that an acquaintance recently reached out to Zynda "asking" him "questions about Bold Conservatives." PENDLEY responded: "About what?" Zynda repeated, "Bold Conservatives." PENDLEY replied, "That's what it [the Draft Sheriff Clarke PAC] was turned into, right?" Zynda stated: "I'm not, I'm not sure, I've never heard of Bold Conservatives." PENDLEY responded, "The PAC name was changed to get, to get the Sheriff Clarke name off of it, so it would stop being a hot-button … Jack just changed the name of it, and I think that's what it is now, Bold Conservatives. Does it still exist?" Zynda replied, "I don't know, how is my name associated with it, because I thought I was taken off of everything?" PENDLEY stated, "I'll have to ask, I haven't, uh, I haven't discussed that with Jack in forever." PENDLEY eventually asked Zynda if the person that reached out to Zynda was "pseudo-media." Zynda said he did not know. PENDLEY stated that he would "find out, uh, from Jack what the deal is there." PENDLEY also told Zynda that while the PAC was not currently "raising any money," DALY's "business" had gone from making approximately two million dollars per month to only one hundred thousand dollars per month, due to technical changes involving Apple. PENDLEY reiterated that he "would

22

call him [DALY] and find out and let you [Zynda] know." PENDLEY also told Zynda that Zynda could "look up" the relevant information on the FEC's website.

80.    Based on my training, experience, knowledge of this investigation, the content of this consensually recorded call described above (to include PENDLEY's explicit representation to Zynda that he, PENDLEY, would discuss Zynda's being listed as the Treasurer of the subject PAC with DALY), and PENDLEY and DALY's history of coordinating in their efforts to conceal the fraudulent scheme described herein, I believe that during this October 13 call between PENDLEY and Zynda, PENDLEY is attempting to mislead Zynda regarding PENDLEY and DALY's use of Zynda's name in their fraudulent scheme.

81.    On October 14, 2022, 2:24 PM CST, according to toll information received pursuant to a court order from T-Mobile, PENDLEY received a call on the 336-918-1994 telephone number from DALY. The call lasted approximately 12 minutes.

<u>Recent Activity</u>

82.    Based on my training, experience, and knowledge of this investigation, I believe PENDLEY and DALY are involved in a continuing criminal scheme involving the Specified Federal Offenses and the Account. As a preliminary matter, I believe that DALY and PENDLEY have continued to coordinate in their efforts to conceal their misconduct. To wit:

83.    Zynda remains, as of approximately 8:00 AM CST on December 29, 2022, listed as the Treasurer and Custodian of Records for the subject PAC. Indeed, in each of the subject PAC's four most recent submissions to the FEC, Zynda is listed as both the subject PAC's Treasurer and the signatory. These include (i) a quarterly report received by the FEC on October 3, 2022; (ii) a quarterly report received by the FEC on June 27, 2022; (iii) a quarterly report received by the FEC on April 15, 2022; and (iv) a "year end" report received by the FEC on January

17, 2022. Based on my training, experience, knowledge of this investigation (to include my knowledge that DALY is known by CLARKE and others to have engaged in the fraudulent scheme described herein), and the nature of the fraudulent scheme described herein (to include the fact that donor-victims of the fraudulent scheme described herein are less likely to connect PENDLEY and DALY to that same scheme by virtue of these false FEC filings which name Zynda as the subject PAC's Treasurer), I believe that these false FEC filings were part of the fraudulent scheme described herein. I also believe that these false FEC filings separately constitute violations of 18 U.S.C. § 1519, which prohibits making false records with intent to impede, obstruct, or influence the proper administration of any matter within the jurisdiction of a federal agency and was previously defined as a Specified Federal Offense.

84.     Additionally, DALY and PENDLEY appear to have discussed, during their October 14, 2022, call, Zynda's concerns about being identified as the PAC's Treasurer, as discussed above.

85.     What's more, it appears that DALY and PENDLEY are continuing to use information associated with prospective donors, which they collected while operating the Draft Sheriff Clarke PAC, to personally profit, contrary to the representations made to donors to the Draft Sheriff Clarke PAC. To wit:

86.     A review of select iMessages and text messages that were received pursuant to a search warrant to Apple on April 22, 2022, revealed DALY discussed the Draft Sheriff Clarke PAC with others via text message and, at times, made reference to how he was using the information of individuals he collected while operating the Draft Sheriff Clarke PAC.

87.     For example, between June 28, 2017, and August 3, 2017, DALY and a telephone number believed to be used by a then-employee (hereinafter referred to as "INDIVIDUAL-1") of

an email marketing company used by the Draft Sheriff Clarke PAC to send solicitations to donors had the following text message exchange, in part:

> INDIVIDUAL-1: "Clarke house file[8] is 100k emails right now?"
>
> DALY: "Affirmative. Maybe a bit more."
>
> INDIVIDUAL-1: "Was it built entirely from draft Clarke mail/online/signatures or did it start from another list? I.e. Is every email specifically opted in to Clarke"
>
> DALY: "Yes, the email addresses of pledge takers and/or donors is now 95k – 105k. So it really is a legitimate opt in list of Clarke supporters. Half of them were already in my own 1M+ list and the other half were acquired through list rental."
>
> INDIVIDUAL-1: "Let's schedule a phone call to discuss rev-shares tomorrow… Have a client I may want to run depending on your ability to geo in IN, MA, and/or OH"

88.    In September 2017, according to information received by search warrant from Yahoo on August 23, 2022, PENDLEY forwarded several emails to Zynda. Those emails reflect that DALY and PENDLEY's fraudulent scheme was designed, at least in part, to compile contact information for prospective donors, which could then be resold or rented. For example:

89.    On September 13, 2017, PENDLEY forwarded Zynda an email PENDLEY received from the Account regarding the launching of a new PAC. The email from PENDLEY to Zynda stated, in part, "Here's another, more Spartan example of a landing page. Jack claims these are less impressive and therefore less effective, but I have my doubts… I do think there is something to be said for giving our potential donees the same kind of page they are used to (and most of them will be coming from Jack's list)."

90.    On September 16, 2017, PENDLEY forwarded Zynda an email PENDLEY received from what appeared to be an email listserv requesting the recipient click on a secure link

---

[8] According to open source research, a house file is essentially leads, donors, subscribers, and supporters who have signed up to receive solicitations from a campaign or committee via email or text messaging.

to participate in a "grassroots digital poll." The email from PENDLEY to Zynda stated, "This is designed to capture email addresses, that are later mined for cash or rented for cash."

91.    On September 18, 2017, PENDLEY forwarded to Zynda an email solicitation from a different Super PAC that DALY and PENDLEY appeared to be affiliated with. The email from PENDLEY to Zynda stated, "Zach, I wrote this this morning, and Jack sent it to his graphics guy to add the whistles and bells and connect it to the landing page and sent it out. It is an example of how Jack now makes money that does not help you or me through our PAC, as he gets paid, but the PAC is not one of ours. They get the rest of the money. They pay him out of it, actually. Once we get our shit together and start sending these out, the money will come to us, we will pay him for his sends, and then we divide the rest between pay for workers, ads and media attention for the subject matter of the email, and the remainder goes back as an investment into the pac. We are getting closer."

92.    During the initial interviews of Zynda in August 2022, Zynda stated that at the time he was working for the Draft Sheriff Clarke PAC, PENDLEY talked about "the list" a lot. Zynda stated that he understood "the list" to be made up of potential donors, that DALY owned "the list," and that "the list" was the second largest in the country, behind only the donor list maintained by former President of the United States Donald J. Trump.

93.    During the proffer of Zynda in September 2022, Zynda stated that when he first started working for DALY and PENDLEY, Zynda understood DALY and PENDLEY had a file containing a large list of donors, which PENDLEY commonly referred to as "the list." Zynda stated that "the list" of names DALY and PENDLEY had was very valuable.

94.    A review of DALY's x1873 Personal Account and x0530 Business Account revealed DALY's sources of income are almost exclusively from email marketing companies.

From 2018 to 2021, these two accounts received over $13,000,000 from email marketing companies, some of which were the same email marketing companies the Draft Sherriff Clarke PAC used to send solicitations to donors.

95.     A review of PENDLEY's x6172 Personal Account revealed PENDLEY's source of income is almost exclusively from DALY. From January 2017 to March 2022, PENDLEY received over $599,000 from DALY.

96.     As described above, during the October 13, 2022, call between Zynda and PENDLEY, after Zynda asked PENDLEY about the subject PAC, PENDLEY represented that while the PAC was not currently raising money, DALY was still making approximately one hundred thousand dollars a month from the "business." Based on the information described above, law enforcement believes that the email marketing companies which comprise the bulk of DALY and PENDLEY's income are paying for access to information associated with prospective donors, at least some of which was compiled as part of the fraudulent scheme described herein.

<u>Additional Incriminating Activity</u>

97.     On October 28, 2022 and October 29, 2022, Zynda, acting at law enforcement's direction, sent two text messages to PENDLEY indicating a desire to speak with PENDLEY to follow-up to their previous conversation that occurred on October 13, 2022, as indicated above. On October 29, 2022, PENDLEY responded to Zynda stating, "I discussed the matter with Jack, and he said he would call you."

98.     On October 29, 2022, Zynda received a text message from DALY at Daly's Island Phone, which stated, "Zach, Jack here. Nate told me i should give you a call this weekend. Do you have some time later tonight or tomorrow?" Zynda, acting at law enforcement's direction, responded to DALY that he would call him "tomorrow," meaning October 30, 2022.

27

99.    On October 30, 2022, at 2:23 PM CST, at law enforcement's direction, Zynda placed a consensually recorded telephone call to DALY at Daly's Island Phone, which was verified using the FBI's telephonic consensual monitoring system. During the call, DALY told Zynda "Nate reminded" him that Zynda was still being carried as the Treasurer on the quarterly reports for "that PAC," implying Bold Conservatives. DALY apologized to Zynda for not being more attentive, and informed Zynda the most routine way to remove Zynda as Treasurer was to file an amended Form 1 with the FEC to list a new Treasurer. Zynda asked DALY if he (Zynda) could call the FEC to ask about "suspending" the Treasurer position for the subject PAC until a replacement was found. DALY responded, "I wouldn't do that" because if Zynda called the FEC and informed the FEC that Zynda wanted to resign as the Treasurer for the subject PAC, the FEC might "memorialize that" and doing so would potentially draw more attention to Zynda. Regarding the fake Zynda account, Zynda asked DALY if he could get access to the fake Zynda account to see when the Treasurer changed over from Zynda to someone else. DALY responded, in part, "I think we created that email address, I haven't checked it, I think we created that email address for you for FEC correspondence purposes." At a later point in the consensually recorded conversation, Zynda stated he had not been paid in a while and assumed it was because he was no longer associated with the subject PAC. DALY responded he could compensate Zynda, if Zynda was open to that idea, because the subject PAC had "some money that has to be disposed of in some way shape or form." DALY told Zynda he could pay Zynda "something myself personally" because if the subject PAC paid Zynda, it would be public record as "all contributions to the PAC and all disbursements from the PAC are filed." DALY stated he would think about ways to compensate Zynda without drawing more attention to Zynda. Towards the end of the consensually recorded conversation, DALY told Zynda he would do a better job keeping in touch with Zynda

28

to "extricate" Zynda from the subject PAC and again stated he would think about ways to compensate Zynda.

100. On November 1, 2022, PENDLEY and DALY had a telephone conversation for approximately 57 minutes. Law enforcement was able to intercept that same communication pursuant to a lawful court order dated October 28, 2022. *See* 22-AP-04. During the telephone call, PENDLEY and DALY discussed a recent news article regarding a suspected DUI car crash that killed a man in Newnan, Georgia. DALY appeared to have some sort of financial stake involving a property in Georgia with the person under the influence at the time of the crash. Amongst other things, PENDLEY and DALY discussed ways in which DALY could protect his financial stake, and they specifically noted DALY would not want to generate any "electronic" material in that effort.

101. On November 4, 2022, Zynda, acting at law enforcement's direction, sent a text message to PENDLEY thanking him for setting up the aforementioned call with DALY. Zynda informed PENDLEY that DALY offered to him for the subject PAC using Zynda's name, but that Zynda did not know how much to ask DALY for. Zynda requested PENDLEY speak to DALY on Zynda's behalf. PENDLEY responded to Zynda stating, "Yes, I'll raise the issue with him and feel him out."

102. On November 9, 2022, Zynda, acting at law enforcement's direction, sent a text message to PENDLEY asking if PENDLEY had a chance to speak with DALY yet. PENDLEY stated he had not. Zynda, acting at law enforcement's direction, responded to PENDLEY that he was planning to follow up with DALY about having his name officially removed from the subject PAC.

103.    On November 10, 2022, according to ongoing information being received by court order from Yahoo, the Account sent two emails to PENDLEY.

104.    On November 11, 2022, at 11:03 AM CST, acting at law enforcement's direction, Zynda placed a consensually recorded telephone call to DALY at Daly's Island Phone, which was verified using the FBI's telephonic consensual monitoring system. Zynda received an automated message stating "the wireless customer you are trying to call is not available. Please try again later." Zynda, acting at law enforcement's direction, sent a text message to PENDLEY asking if DALY had another telephone number to contact DALY. PENDLEY responded, "703.200.6057." Zynda, acting at law enforcement's direction, responded to PENDLEY asking if PENDLEY had a chance to talk to DALY. PENDLEY responded, "No. And I am scrambling today."

105.    On November 12, 2022, at 11:30 AM CST, acting at law enforcement's direction, Zynda placed a consensually recorded telephone call to DALY at the 703-200-6057 telephone number, which was verified using the FBI's telephonic consensual monitoring system. DALY did not answer but sent Zynda a text message stating, "May I call you in a bit?" Zynda, acting at law enforcement's direction, responded requesting a good time for DALY to talk. DALY did not respond.

106.    On November 13, 2022, at 3:43 PM CST, acting at law enforcement's direction, Zynda placed a consensually recorded telephone call to DALY at Daly's Island Phone, which was verified using the FBI's telephonic consensual monitoring system. DALY informed Zynda that he found someone to serve as the new Treasurer for the subject PAC, but that nothing had been filed with the FEC yet. DALY reminded Zynda that everything with the FEC was electronic, "you get your login credentials, you fill out a form online... and then you press a few buttons, and tada, it's uploaded." In following up on Zynda's previous consensually recorded telephone call with DALY

on October 30, 2022, Zynda told DALY he had been trying to get ahold of PENDLEY to seek PENDLEY's assistance in talking to DALY about Zynda's worth, but that PENDLEY seemed too busy to help. DALY responded that he similarly did not like discussing someone's worth, but "if I sent you five grand... would that put a smile on your face." Zynda asked DALY if the proposed $5,000 was for services already responded, meaning back pay for being listed as the Treasurer of the subject PAC for the past several years, to which DALY responded, "yeah." DALY asked Zynda to send him banking information so DALY could wire Zynda the $5,000 from his "for profit business, not the PAC."

107.    On November 13, 2022, Zynda, acting at law enforcement's direction, sent DALY a text message to Daly's Island Phone with his banking information so DALY could initiate a wire transfer.

108.    On November 14, 2022, Zynda received a text message from DALY at Daly's Island Phone containing a screenshot of a wire transfer form. DALY also stated, "Just need a street or mailing address for you." Zynda, acting at law enforcement's direction, responded to DALY at Daly's Island Phone with the address listed on his bank account.

109.    On November 14, 2022, Zynda received a wire transfer of $5,000 from DALY.

110.    On November 21, 2022, Zynda, acting at law enforcement's direction, sent a text message to PENDLEY asking PENDLEY why the FBI contacted Zynda asking "a lot of questions about draft sheriff Clark PAC!?" Approximately one minute later, PENDLEY attempted to call Zynda. Zynda, acting at law enforcement's direction, sent a text message to PENDLEY stating he was "in the office I'm going to tell my boss I'm stepping out for lunch." PENDLEY responded, "I really don't know what they're after there. I'm curious about the conversation though."

31

111.    On November 21, 2022, at 9:17 AM CST, acting at law enforcement's direction, Zynda placed a consensually recorded telephone call to PENDLEY at the 336-918-1994 telephone number, which was verified using the FBI's telephonic consensual monitoring system. Zynda told PENDLEY he was freaking out and that the FBI asked a lot of questions about the subject PAC, Zynda's role in the subject PAC, Zynda's role as Treasurer of the subject PAC, conversations Zynda had with PENDLEY, and about Zynda's relationship with DALY. PENDLEY told Zynda the FBI was likely conducting a general inquiry following up on somebody's claim the Draft Sheriff Clarke PAC was a scam PAC. However, PENDLEY expressed concern, stating "out of the blue to mention my name, that freaks me out." PENDLEY told Zynda he was in the media "a time or two" for the Draft Sheriff Clarke PAC and that he was paid by the subject PAC for "copyright work." PENDLEY speculated DALY may have "screwed up some filings or something," but that there was a professional Treasurer who performed the filings for the Draft Sheriff Clarke PAC. PENDLEY told Zynda it was not uncommon for the Treasurer of a PAC to be "some fancy bigshot millionaire... who never does anything." PENDLEY asked Zynda if the FBI seemed to think Zynda was not genuinely supportive of CLARKE. Zynda told PENDLEY the FBI brought up, multiple times, if Zynda knew when CLARKE decided not to run. PENDLEY responded, "nobody knows that," but that when CLARKE appeared on a radio show in "like July or something" and said he was not running for U.S. Senate "we shut it down after that very quickly." PENDLEY told Zynda it was very clear at that point that CLARKE was not going to run. In trying to calm Zynda down, PENDLEY told Zynda "they always want the big guy, they don't want you... if there were some illegal stuff that went on" and that DALY "is one who will cut corners when he's filing something." PENDLEY further stated the FBI did not want "the lowly IT man who said you can use my name, pay me a few bucks for my time." Also in trying to calm Zynda down, PENDLEY told Zynda "our

32

work in the Draft Sheriff Clarke PAC was complicated" by what CLARKE was "saying to us privately" versus what he was saying publicly, such as, "I haven't decided to run." Zynda asked PENDLEY if he should tell the FBI that he was the Treasurer in name only. PENDLEY responded that being the Treasurer in name only was very common, but that he did not want to be in a position of telling Zynda what to tell the FBI. PENDLEY further stated he would never try to "cook up a story, because the truth is legal," and "why lie when the truth will do?" At the end of the call, PENDLEY agreed to reach out to DALY to figure out what was going on.

112. Between November 21, 2022 and November 26, 2022, according to ongoing information being received by court order from AT&T, Pendley's Island Phone exchanged over a dozen calls with the 703-200-6057 telephone number and Daly's Island Phone after Zynda placed the aforementioned consensually recorded telephone call to PENDLEY at the 336-918-1994 telephone number on November 21, 2022. Further, between December 7, 2022 and December 19, 2022, according to ongoing information being received by court order from Yahoo, the Account sent PENDLEY six emails.

<u>Interview of David Clarke</u>

113. On December 20, 2022, law enforcement interviewed CLARKE. CLARKE stated he never had any intention of running for Senate – not in 2017 or at any other time – but recalled hearing of DALY's efforts to draft him as a Senate candidate while attending the 2017 CPAC. CLARKE stated he would not be able to pick DALY out of a lineup and therefore did not recall if he ever met DALY. However, CLARKE recalled briefly attending a reception the Draft Sheriff Clarke PAC hosted at the 2017 CPAC wherein CLARKE either drew the winning name of a CLARKE bobblehead or announced the winner's name. CLARKE indicated he may have said "a

33

few words" to the individuals who attended the reception, but CLARKE did not say anything about his intentions of running for Senate.

114.     With respect to the July 21, 2017 radio interview wherein CLARKE called the Draft Sheriff Clarke PAC a scam PAC, CLARKE stated he was informed of the term scam PAC by other individuals he was associated with. These individuals informed CLARKE about DALY's history of running scams, to include scam PACs, and because CLARKE agreed the term applied to what DALY was doing with respect to the Draft Sheriff Clarke PAC, CLARKE started to use the term scam PAC when referring to the Draft Sheriff Clarke PAC.

115.     CLARKE stated that he did not recall any conversations with DALY or others associated with the Draft Sheriff Clarke PAC about his interest and/or intention of running for Senate. Further, CLARKE did not recall anything DALY or others associated with the Draft Sheriff Clarke PAC did to try to convince him to run for Senate. CLARKE stated he was aware of some billboards the Draft Sheriff Clarke PAC put up around Milwaukee and that the Draft Sheriff Clarke PAC did some polling, but CLARKE did not recall any conversations with DALY or others associated with the Draft Sheriff Clarke PAC about these efforts.

116.     With respect to the aforementioned September 2, 2017 email the Account received from CLARKE with the subject line, "Jack Daly is at it again – he's collecting contributions," CLARKE stated that by September 2017, the Draft Sheriff Clarke PAC was starting to interfere with things CLARKE wanted to do after serving as Sheriff. As a result, CLARKE stated he emailed DALY, at least in part, to get ahead of anything that may jeopardize a post-retirement opportunity for CLARKE.

34

117.    According to information received by search warrant from Google on April 19, 2022, the Account performed the following notable searches on or about the following dates, not including those already mentioned:

    a.   March 20, 2017: "sheriff Clarke won't run for senate"

    b.   March 31, 2017: "what is the difference between conversion and theft"

    c.   May 22, 2017: "bice scampac sheriff Clarke"

    d.   September 25, 2017: "program to change ip address"

    e.   May 18, 2018: "scam pac indictment"

    f.   August 10, 2018: "Willie Nelson IRS"

    g.   August 10, 2018: "wesley snipes irs"

    h.   August 10, 2018: "lauren hill irs"

    i.   August 12, 2018: "benefits of renouncing us citizenship"

    j.   August 22, 2018: "feca violations"

    k.   August 22, 2018: "feca violations statute of limitations"

    l.   August 22, 2018: "wire fraud statute of limitations"

Preservation of Accounts

118.    On November 18, 2022, a preservation request under 18 U.S.C. § 2703(f) was sent to Google regarding Google accounts registered under jackwdaly@gmail.com requesting Google preserve available data for 90 days.

## BACKGROUND CONCERING GOOGLE[9]

---

[9] The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages: the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; and product pages on about.google.com.

119.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications. Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, and other services. Many of these free services offer additional functionality if the user signs into their Google Account.

120.     In addition, Google offers an operating system for mobile devices, including cellular phones, known as Android. Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

121.     Google advertises its services as "One Account. All of Google working for you." Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public. In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

122.     **GMAIL:** Google provides email services (called Gmail) to Google Accounts through email addresses at gmail.com or enterprise email addresses hosted by Google.  Gmail can be accessed through a web browser or a mobile application. Additional email addresses ("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated with the Google Account by the user. Google preserves emails associated with a Google Account indefinitely, unless the user deletes them.

123.     **CONTACTS:** Google provides an address book for Google Accounts through Google Contacts. Google Contacts stores contacts the user affirmatively adds to the address book,

36

as well as contacts the user has interacted with in Google products. Google Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them.

124. **CALENDAR:** Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them.

125. **WEB-BASED CHATS** and **MOBILE MESSAGING:** Google provides several messaging services including Duo, Messages, Hangouts, Meet, and Chat. These services enable real-time text, voice, and/or video communications through browsers and mobile applications, and also allow users to send and receive text messages, videos, photos, locations, links, and contacts. Google may retain a user's messages if the user hasn't disabled that feature or deleted the messages, though other factors may also impact retention.

126. **GOOGLE DRIVE** and **GOOGLE KEEP:** Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents

37

created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit. Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One. In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me." Google preserves files stored in Google Drive indefinitely, unless the user deletes them. Google Keep is a cloud-based notetaking service that lets users take notes and share them with other Google users to view, edit, or comment. Google Keep notes are stored indefinitely, unless the user deletes them.

127. **GOOGLE PHOTOS:** Google offers a cloud-based photo and video storage service called Google Photos. Users can share or receive photos and videos with others. Google Photos can be trained to recognize individuals, places, and objects in photos and videos and automatically tag them for easy retrieval via a search bar. Users have the option to sync their mobile phone or device photos to Google Photos. Google preserves files stored in Google Photos indefinitely, unless the user deletes them.

128. **GOOGLE MAPS:** Google offers a map service called Google Maps which can be searched for addresses or points of interest. Google Maps can provide users with turn-by- turn directions from one location to another using a range of transportation options (driving, biking,

walking, etc.) and real-time traffic updates. Users can share their real-time location with others through Google Maps by using the Location Sharing feature. And users can find and plan an itinerary using Google Trips. A Google Account is not required to use Google Maps, but if users log into their Google Account while using Google Maps, they can save locations to their account, keep a history of their Google Maps searches, and create personalized maps using Google My Maps. Google stores Maps data indefinitely, unless the user deletes it.

129.    **GOOGLE PAY:** A subsidiary of Google, Google Payment Corporation, provides Google Accounts an online payment service called Google Pay (previously Google Wallet), which stores credit cards, bank accounts, and gift cards for users and allows them to send or receive payments for both online and brick-and- mortar purchases, including any purchases of Google services. Users may delete some data associated with Google Pay transactions from their profile but Google Payment Corporation retains some records for regulatory purposes.

130.    **GOOGLE CHROME** and **MY ACTIVITY:** Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account.

131.    **GOOGLE PLAY:** Google Accounts can buy electronic media, like books, movies, and music, and mobile applications from the Google Play Store. Google Play records can include records of whether a particular application has been or is currently installed on a device. Users cannot delete records of Google Play transactions without deleting their entire Google Account.

132.     **GOOGLE VOICE:** Google offers a service called Google Voice through which a Google Account can be assigned a telephone number that can be used to make, record, and forward phone calls and send, receive, store, and forward SMS and MMS messages from a web browser, mobile phone, or landline. Google Voice also includes a voicemail service. Records are stored indefinitely, unless the user deletes them.

133.     **YOUTUBE:** Google also offers a video platform called YouTube that offers Google Accounts the ability to upload videos and share them with others. Users can create a YouTube channel where they can upload videos, leave comments, and create playlists available to the public. Users can subscribe to the YouTube channels of others, search for videos, save favorite videos, like videos, share videos with others, and save videos to watch later. More than one user can share control of a YouTube channel. YouTube may keep track of a user's searches, likes, comments, and change history to posted videos. YouTube also may keep limited records of the IP addresses used to access particular videos posted on the service. Users can also opt into a setting to track their YouTube Watch History. For accounts created before June 2020, YouTube Watch History is stored indefinitely, unless the user manually deletes it or sets it to auto-delete after three or eighteen months. For accounts created after June 2020, YouTube Watch History is stored for three years, unless the user manually deletes it or sets it to auto-delete after three or eighteen months.

134.     **INTEGRATION OF GOOGLE SERVICES:** Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive. Google Hangout, Meet, and Chat conversations pop up within the same browser window

40

as Gmail. Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive. If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts. Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account. And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

135. **SUBSCRIBER RECORDS:** When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender. If a user is paying for services, the user must also provide a physical address and means and source of payment.

136. **ACCESS REORDS:** Google typically retains and can provide certain transactional information about the creation and use of each account on its system. Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account. In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

41

137.    Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control. Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

138.    **BROWSING, SEARCH,** and **APPLICATION USE HISTORY:** Google collects and retains data about searches those users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and certain global settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts in to automatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

139.    **LOCATION HISTORY:** Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use. This location data can derive from a range of

42

sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking. The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes it or opts to automatically delete their Location History and Web & App Activity after three or eighteen months. Accounts created after June 2020 auto-delete Location History after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

140. In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. This can be true even if subscribers insert false information to conceal their identity; this information often nevertheless provides clues to their identity, location or illicit activities.

141. Based on my training and experience, messages, emails, voicemails, photos, videos, documents, and internet searches are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored

43

communications and files connected to a Google Account may provide direct evidence of the offenses under investigation.

142.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

143.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

144.     Other information connected to the use of a Google account may lead to the discovery of additional evidence.  For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity,

44

documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

145.    Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users, their location(s) and activities at certain times relevant to the offenses at issue, the identities of their accomplices and co-conspirators, communications with those accomplices and co-conspirators, and actions taken and research performed relating to the criminal offenses at issue.

## CONCLUSION

146.    Based on the forgoing, I request that the Court issue the proposed search warrant.

147.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google LLC. Because the warrant will be served on Google LLC, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**<u>ATTACHMENT A</u>**
**Matter No. 2021R00321**

**Property to Be Searched**

This warrant applies to information associated with jackwdaly@gmail.com (the

"account") that is stored at premises owned, maintained, controlled, or operated by Google LLC,

a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

**Particular Things to be Seized**

I.     **Information to be disclosed by Google LLC ("Google")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) November 18, 2022 with the Google Reference Number 26897118, Google is required to disclose to the government for each account or identifier listed in Attachment A the following information from April 1, 2022 to present, unless otherwise indicated:

- **SUBSCRIBER AND ACCESS RECORDS:** All business records and subscriber information, in any form kept, pertaining to the account, including: full name; physical address; telephone numbers, including SMS recovery and alternate sign-in numbers; alternative and recovery email addresses, including those provided during registration; usernames, screennames and other identifiers; account status; account creation date; account registration IP address; length of service; records of session times and durations, including log-in IP addresses; methods of connecting; log files; subscriber change history; means and source of payment (including any credit or bank account number); and detailed billing records;

- **DEVICES:** All device information associated with the accounts, including but not limited to, manufacture names, model numbers, serial number, media access control (MAC) addresses, international mobile equipment identifier (IMEI) numbers, FCC ID numbers, Android IDs, and telephone numbers;

- **SERVICES:** The types of services utilized, including connected applications and sites, and any dates associated with the commencement or termination of that use;

- **FORWARDING OR FETCHING ACCOUNTS:** All forwarding or fetching accounts relating to the accounts;

- **BROWSING, SEARCH, and APPLICATION USE HISTORY:** All Internet search, browsing history, and application usage history, such as Web & App Activity**,** including: search terms; browsing history, including application usage; bookmarks; passwords;

autofill information; alerts, subscriptions, and other automated searches, including associated notifications and creation dates; all text typed into the Google Chrome address bar or Google search bar, including URLs and IP addresses; all URLs or IP addresses clicked on; user settings; and all associated logs and change history;

- **LOCATION HISTORY:** All records indicating the location at which the account was active, such as Location History and Web & App Activity, including: GPS data; cell site/cell tower information; IP addresses; information associated with each location record, including the source of the data, date and time, latitude and longitude, estimated accuracy, device and platform, and inferences drawn from sensor data (such as whether a user was at rest, walking, biking, or in a car); and associated logs and user settings, including Timeline access logs and change history;

- **GMAIL:** The contents of all emails associated with the account, including, but not limited to: stored or preserved copies of emails sent to and from the account, draft emails, and deleted emails; attachments; the source and destination addresses associated with each email; the date and time at which each email was sent; the size and length of each email; and true and accurate header information including the actual IP addresses of the sender and recipients of the emails;

- **CONTACTS:** Any records pertaining to the user's contacts, including: address books; contact lists, including autocomplete suggestions; social network links; groups, including Google Groups to which the user belongs or communicates with; user settings; and all associated logs and change history;

- **CALENDAR:** Any records pertaining to the user's calendar, including: Google Calendar entries; Google Tasks; reminders; appointments; invites; and goals; the sender and recipients of any event invitation, reminder, appointment, or task; user settings; and all associated logs and change history;

- **WEB-BASED CHATS:** The contents of all chats associated with the account, including Google Hangouts, Meet, and Chat, in any format (text, audio, or video) including, but not limited to: stored, deleted, and draft chat communications, including attachments and links; the source and destination addresses associated with each communication, including IP addresses; the size and length of each communication; user settings; and all associated logs, including access logs and change history;

- **GOOGLE DRIVE**: The contents of all records associated with the account in Google Drive (including Docs, Sheets, Forms, and Slides) and Google Keep, including: files, folders, media, notes, lists, applications, and other data uploaded, created, stored, or shared with the account including drafts and deleted records; third-party application data and backups; SMS data and device backups; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device,

48

other Google service (such as Google Classroom or Google Group), or third-party application associated with each record; and all associated logs, including access logs and IP addresses, of each record;

- **GOOGLE PHOTOS**: The contents of all media associated with the account in Google Photos or Picasa, including: photos, GIFs, videos, animations, collages, icons, or other data uploaded, created, stored, or shared with the account, including drafts and deleted records; third-party data; the creation and change history of each record; accounts with access to or which previously accessed each record; any location, device, or third-party application data associated with each record; and all associated logs, including access logs and IP addresses, of each record;

- **GOOGLE MAPS and TRIPS**: All maps data associated with the account, including Google Maps and Google Trips, including: all saved, starred, and privately labeled locations; search history; routes begun; routes completed; mode of transit used for directions; information associated with locations and other data associated with My Maps and Location Sharing; accounts and identifiers receiving or sending Location Sharing information to the account; changes and edits to public places; and all associated logs, including IP addresses, location data, and timestamps, and change history;

- **GOOGLE PLAY STORE:** All activity relating to Google Play, including: downloaded, installed, purchased, used, and deleted applications, movies, music, television shows, books, magazines, games, and other files; details of the associated device and Android ID for each application, medium, or file; payment transactions; user settings; and all associated logs, including IP addresses, location data, timestamps, and change history;

- **MOBILE MESSAGING:** The contents of all messages associated with the account, including Google Duo, Android Messages, and Google Allo, in any format (e.g. SMS, MMS, or RCS) including, but not limited to: stored, deleted, and draft messages, including attachments and links; the source and destination addresses associated with each communication, including IP addresses and telephone numbers; the size and length of each communication; associated telephone numbers, including SMS recovery numbers; usernames and other identifiers; user settings; and all associated logs and change history;

- **YOUTUBE CONTENTS:** The contents of all media associated with the account on YouTube, whether active, deleted, or in draft, including: copies of videos and other media only if uploaded to, saved to, shared by or shared with the account; edits, comments, likes, chats, and other interactions, including associated URLs; search history; channels; subscriptions; subscribers, friends, and other contacts; playlists; connected applications; associated URLs for each record; creation and change history; privacy settings for each record; and all associated logs, including IP addresses, locations, timestamps, and device identifiers;

49

- **YOUTUBE WATCH HISTORY:** A record of the account's watch history, including: accessed URLs and their associated duration, privacy settings, upload timestamps, tags, IP addresses, change history, location information, and uploading account or identifier; the logs for each access by the account, including IP address, location, timestamp, and device identifier; and change history;

- **YOUTUBE SUBSCRIBER RECORDS:** All business and subscriber records associated with the account on YouTube, including: birthday; name; username and other identifiers; linked accounts; alternate or recovery emails; telephone numbers, including SMS recovery numbers; physical addresses; account status; account creation date; account registration IP address; length of service; means and source of payment (including any credit or bank account number); associated devices; associated Android IDs; and associated logs and change history;

- **ADWORDS/GOOGLE ADS:** All records for advertising transactions by the account relating to Google Ads, AdWords, and DoubleClick for Advertisers, including: bid, location of advertisement (including URL), permitted advertisements, blocked advertisements, design and customization settings, and engagement records; payment transactions; user settings; and all associated logs, including IP addresses, location data, timestamps, and change history;

- **ADVERTISING SUBSCRIBER RECORDS:** All business and subscriber records associated with the account on AdSense, Google Ads, Adwords, and DoubleClick by Google, including: name; user name; physical address; alternate or recovery emails; telephone numbers, including SMS recovery numbers; linked accounts; account status; account creation date; account registration IP address; length of service; associated devices; associated AndroidIDs; means and source of payment (including any credit or bank account number); and all associated logs and change history;

- **LINKED NON-GOOGLE ACCOUNTS:** All records relating to connected applications and websites not controlled by Google, including: applications and websites connected to the account at any time; associated account identifiers; privacy settings and account access permissions; and all associated logs, including access logs using Google credentials, timestamps, IP addresses, and change history.

Google is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.	Information to be seized by the government

All information described above in Section I that constitutes evidence and/or instrumentalities of violations of 18 U.S.C. § 1001 (false statements within the jurisdiction of a federal agency); 18 U.S.C. § 1519 (making false records with intent to impede, obstruct or influence the proper administration of any matter within the jurisdiction of a federal agency); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1956 (money laundering), since April 1, 2022, including, for each account or identifier listed on Attachment A, information pertaining to the following matters, persons, or entities:

    a.	Sheriff David Clarke (including but not limited to communications with Sheriff David Clarke and his representatives, counsel, or proxies);

    b.	The Sheriff David Clarke for U.S. Senate (Official Draft Campaign) Super PAC;

    c.	The rules and regulations promulgated by the Federal Election Commission;

    d.	The rules and standards imposed by the Federal Election Campaign Act; and

    e.	The finances—including but not limited to expenditures, obligations, and income—of Jack W. Daly and Nathanael K. Pendley;

    f.	The identity of the person(s) who created or used the account, including records that help reveal the whereabouts of such person(s);

    g.	Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the account owner;

    h.	Any records pertaining to the means and source of payment for services (including any credit card or bank account number or digital money transfer account information);

    i.   Evidence indicating the subscriber's state of mind as it relates to the crime under investigation, including interests and motivations; and

    j.   Evidence that may identify any co-conspirators or aiders and abettors, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.